MOSS ET AL. *v.* BUSH ET AL.

[Cite as *Moss v. Bush,* 105 Ohio St.3d 458, 2005-Ohio-2419.]

(No. 2004–2088—Submitted February 14, 2005—Decided May 19, 2005.)

─────────────

MOYER, C.J.

{¶ 1} This case originated as an election contest challenging the results of the November 2, 2004 election in Ohio for President and Vice–President of the United States. The contestors, 37 Ohio residents who allegedly had voted in the presidential election, filed an election-contest petition pursuant to R.C. Chapter 3515. The named contestees were President George W. Bush, Vice–President Richard Cheney, Bush–Cheney adviser Karl Rove, Bush–Cheney '04, Inc. (alleged by the contestors to be the political committee for Bush and Cheney), Ohio Secretary of State Kenneth Blackwell, and Ohio's presidential electors.

{¶ 2} On January 6, Congress met in joint session pursuant to Section 15, Title 3, U.S.Code and certified George W. Bush and Richard B. Cheney the winners of the November 2, 2004 national presidential and vice-presidential election. Five days later, on January 11, 2005, contestors applied to dismiss their election contest. That application was granted, and the case was dismissed. *Moss v. Bush,* 104 Ohio St.3d 1449, 2005-Ohio-71, 820 N.E.2d 934.

{¶ 3} Before me is a motion filed January 18, 2005, by Secretary of State Blackwell and Ohio's 20 presidential electors seeking the imposition of sanctions against the attorneys who represented the contestors. The movants assert that counsel for the contestors filed a meritless complaint without having adequately researched the law relative to their grievances and failed to adhere to the procedures and time requirements set forth in the election-contest statutes and the Rules of Civil Procedure. They claim that the complaint was based on "theory, conjecture, hypothesis, and invective" rather than evidence and that the contestors filed this contest proceeding "only for partisan political purposes." The movants note that the petition accused Ohio election officials of blatant misconduct, including fraud, and assert that contestors had no evidence of fraud, let alone the clear and convincing evidence that a finding of fraud requires. They accuse opposing counsel of filing meritless and frivolous motions and demanding

unwarranted discovery. They assert that the contestors acted for the purpose of "generating headlines and harassing the rightful winners of the election" rather than for legitimate purposes.

{¶ 4} I have little doubt that many informed Ohioans share the movants' assessment of the motives of these contestors and disdain for their actions. The contestors indeed made multiple allegations in the complaint that are, at best, highly improbable and potentially defamatory, inflammatory, and devoid of logic. They asserted no less than a vast criminal conspiratorial scheme to subvert our democracy through massive election fraud. Examples of these allegations are:

{¶ 5} ● George W. Bush, Richard Cheney, Karl Rove, and Bush–Cheney '04, Inc., participated personally and/or substantially "in devising and/or implementing [a] pattern of vote fraud and discrimination * * * which operated to deprive numerous Ohio citizens of their constitutional and statutory rights";

{¶ 6} ● Ohio Secretary of State J. Kenneth Blackwell participated personally and substantially "in ordering and/or acquiescing in the commission of numerous instances of election fraud in violation of Ohio criminal law after November 2, 2004, which actions served to cover-up and delay disclosure of the fraudulent scheme";

{¶ 7} ● Election fraud or other irregularity must have occurred in the counting of the vote in Ohio and a number of other states because the ultimately certified result showing John Kerry winning only 48.7 percent of the Ohio vote was inconsistent with exit polls;

{¶ 8} ● Preliminary exit polls forecasting a Kerry victory were more reliable than the certified election results, and there was a 98.7 percent likelihood that Kerry actually received a greater percentage of the popular vote than Bush;

{¶ 9} ● The contestees schemed to "steal the election" by reducing or eliminating the time the "fraudulent results would be subjected to serious scrutiny."

{¶ 10} ● "[T]raditional means of vote fraud were used. * * * [U]nlawful ballots (not cast by a registered voter but merely added to the stack of ballots being counted) were added to those cast by lawful voters and * * * lawfully cast ballots were either destroyed or altered (as for example by adding a second vote to the one allowed vote for President and thereby invalidating the ballot)."

{¶ 11} ● Secretary of State Blackwell ordered all 88 boards of election to prevent public inspection of poll books until after certification of the vote on December 6, 2004, apparently to "cause[ ] violations [of state law] by every board of elections in the state."

{¶ 12} ● An unknown conspirator "was actually changing the vote totals" electronically from an unknown location, which could have been virtually anywhere in the world;

{¶ 13} • Conspirators procured fraudulent vote totals by inserting "unauthorized and so far undetected operating instructions into the software" used in connection with voting machines, and "some or all of the unauthorized operating instructions were pre-set to delete themselves a given amount of time after the election."

{¶ 14} Contestors further alleged fraud in the casting and counting of absentee ballots and alleged individual election incidents occurring throughout the state, including isolated voting-machine, registration, and provisional-ballot errors and irregularities, as well as long lines and discriminatory distribution of voting machines.

{¶ 15} Had the contestors not dismissed the election contest, several or all of these allegations of fraudulent conduct may well have been subject to dismissal pursuant to Civ.R. 9(B), which requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The voluntary dismissal of the election contest, however, renders that issue moot.

{¶ 16} Hundreds of persons—including members of both the Democratic and Republican Parties—served on boards of elections, at polling places, and in other capacities to conduct the presidential election in Ohio on November 2, 2004. While that election was not perfect, the contestors' allegations, and the notoriety they produced, proclaimed to the world that Ohio did not conduct a fair and lawful presidential election. By their conduct, contestors, their attorneys, and other persons who appeared to be more interested in their own notoriety than in the facts profoundly disserved Ohioans of both political parties who worked so hard to conduct a fair election. Despite the apparently scurrilous nature of most of these allegations, I am, however, guided by the relevant statutes and precedent in considering the motion before me.

{¶ 17} R.C. 3515.11 provides that "[t]he proceedings at the trial of the contest of an election shall be similar to those in judicial proceedings, in so far as practicable, and shall be under the control and direction of the court which shall hear and determine the matter without a jury, with power to order or permit amendments to the petition or proceedings as to form or substance." Accordingly, this court has employed the Rules of Civil Procedure in adjudicating election contests. For example, the court has recognized that a party to an election contest could invoke Civ.R. 26(B)(3), which authorizes, under certain conditions, discovery of an opponent's work product. *In re Election of November 6, 1990 for the Office of Atty. Gen. of Ohio* (1991), 57 Ohio St.3d 614, 567 N.E.2d 243. Similarly, in a separate opinion, the court entertained a motion filed under Civ.R. 41(B)(2), which authorizes dismissal of a case after the presentation of the

plaintiff's case-in-chief. *In re Election of November 6, 1990 for the Office of Atty. Gen. of Ohio* (1991), 58 Ohio St.3d 604, 567 N.E.2d 984.

{¶ 18} Later, a contestee who had been successful in an election contest filed a motion for costs, seeking reimbursement for various expenses, including attorney fees incurred in defending his election. *In re Election of November 6, 1990 for the Office of Atty. Gen. of Ohio* (1991), 62 Ohio St.3d 1, 577 N.E.2d 343. As authority for the request, the contestee cited R.C. 3515.09,[1] Civ.R. 54(D),[2] and R.C. 2323.51.[3]

{¶ 19} This court held that Civ.R. 54(D) and R.C. 2323.51 are not applicable to election contests, noting that we had long held that the "procedures prescribed for election contests are specific and exclusive." Id., 62 Ohio St.3d at 1, 577 N.E.2d 343. We acknowledged that R.C. 3515.11 provides that "[t]he proceedings at the trial of the contest of an election shall be similar to those in judicial proceedings, in so far as practicable." Id. at 2, 577 N.E.2d 343. We recognized, however, that "[a]lthough this provision incorporates into election contest proceedings some rules and statutes governing civil actions, such incorporation is limited to those rules and statutes that would pertain 'at the trial of the contest.'" Id.

{¶ 20} In the case at bar, the movants rely upon Civ.R. 11[4] and S.Ct.Prac.R. XIV(5)[5] to support their request for an award of costs and sanctions, asserting that the contestors engaged in misconduct in connection with the filing and initial prosecution of the election contest prior to dismissing it. However, that dismissal occurred before a trial had even been scheduled. I conclude that Civ.R. 11 and S.Ct.Prac.R. XIV(5) cannot be deemed to pertain to the trial of the contest, as contemplated by R.C. 3515.11, in these circumstances.

{¶ 21} The power to sanction attorneys who file baseless actions is the power to punish and deter. The United States Supreme Court has observed that the

---

1. R.C. 3515.09 specifically authorizes an award of costs to the successful party in an election contest.

2. {¶ a} Civ.R. 54(D) provides:
 {¶ b} "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

3. R.C. 2323.51 provides for an award of attorney fees to a party harmed by "frivolous conduct" in a civil action.

4. Civ.R. 11 authorizes an award of expenses and reasonable attorney fees to an opposing party when an attorney signs a pleading, motion, or other document while aware that the document lacks good ground to support it.

5. S.Ct.Prac.R. XIV(5)(A) authorizes the imposition of sanctions, including reasonable expenses, reasonable attorney fees, costs, or double costs, against counsel when an appeal or other action is found to be frivolous.

purpose of Fed.R.Civ.P. 11, which is analogous to Civ.R. 11, is to curb abuse of the judicial system because "[b]aseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay." *Cooter & Gell v. Hartmarx Corp.* (1990), 496 U.S. 384, 398, 110 S.Ct. 2447, 110 L.Ed.2d 359. The court noted that the specter of Rule 11 sanctions encourages civil litigants to " 'stop, think and investigate more carefully before serving and filing papers.' " Id., quoting Amendments to Federal Rules of Civil Procedure (1983), 97 F.R.D. 165, 192 (March 9, 1982 letter from Judge Walter Mansfield, Chairman, Advisory Committee on Civil Rules).

{¶ 22} An election contest, however, is not a typical lawsuit. Because R.C. 3515.09 provides a very short time after an election within which an election contest petition may be filed, a prospective contestor has limited time to investigate all the facts surrounding an election, particularly where, as here, the challenge is to a statewide election. Yet the election contest statutes exist to ensure that the will of the electorate is correctly recorded. Whether the filing of election contests should be discouraged is a matter of public policy not for this court.

{¶ 23} The General Assembly could have expressly authorized courts to sanction those who pursue frivolous election contests. It has not. It has provided for election contests and has authorized courts to use standard procedures to resolve those contests by trial. See R.C. 3515.11. The General Assembly, in authorizing the use of standard procedures to resolve election contests, did not specifically invest courts with the authority to, in effect, reopen the merits of dismissed election contest claims. Such authority would be required to justify an award of sanctions based on the filing of an election contest claimed to have been filed without evidentiary support.

{¶ 24} Because there will be no trial in the case at bar, Civ.R. 11 and S.Ct.Prac.R. XIV(5)(A) are not rules that would pertain "at the trial of the contest." R.C. 3515.11. Under these circumstances, the election-contest statutes found in R.C. Chapter 3515 do not contemplate an award of sanctions to punish the filing of a frivolous election contest. I conclude that I am not authorized by R.C. 3515.11 to invoke Civ.R. 11 or S.Ct.Prac.R. XIV(5) to impose sanctions where attorneys filed an election contest but dismissed it shortly thereafter and before trial is scheduled.

{¶ 25} Even were I to consider the substantive merit of the motion before me, without the production of more evidence than is now before the court, I could not conclude that the standards imposed upon attorneys by these rules were violated in this case. Because contestors have voluntarily dismissed the contest and no trial will occur, that evidence will not be forthcoming.

{¶ 26} Contestors' original complaints that existing election procedures resulted generally in long lines or undue delay or inconvenience to voters at the November 2004 election are better addressed to the legislative and executive branches of government. I take judicial notice that election-reform initiatives are currently under discussion at both the state and federal levels. See, e.g., 2005 Sub.H.B. No. 3; H.R. 1835, 109th Cong., 1st Sess. (2005); H.R. 2104, 109th Cong., 1st Sess. (2005); S. 450, 109th Cong. 1st Sess. (2005).

{¶ 27} I conclude that an award of sanctions in this case is not authorized by the statutes governing election contests. I therefore overrule contestees' motion for costs and sanctions. The motion of the Secretary of State and Ohio's presidential electors is overruled.

Motion denied.

---

Jim Petro, Attorney General, and Arthur J. Marziale Jr., Senior Deputy Attorney General, for movants.

Robert J. Fitrakis, Susan Truitt, and Peter Peckarsky, pro se.

Clifford O. Arnebeck Jr., pro se.

Wolman & Associates, Benson A. Wolman, and Susan B. Gellman, urging denial of the motion for amici curiae, U.S. Senator Russell Feingold and U.S. Representatives William Lacy Clay, John Conyers Jr., Barney Frank, Dennis Kucinich, Sheila Jackson Lee, Zoe Lofgren, Jim McDermott, Marty Meehan, Jerrold Nadler, James Oberstar, Donald Payne, Linda Sanchez, Adam Schiff, Robert Scott, Chris van Hollen, Maxine Waters, Robert Wexler, and Lynn Woolsey.