[Cite as *Isaac v. Malott*, 2019-Ohio-3210.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STEVEN R. ISAAC, et al., | : | |
| | : | Case Nos. 18CA9 |
| Plaintiffs-Appellants/ | : | 18CA10[1] |
| Cross-Appellees, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| ALICE MALOTT, Individually | : | |
| and as POA and as Executor, | : | |
| | : | |
| Defendant-Appellee/ | : | |
| Cross-Appellant. | : | **Released: 08/07/19** |

_____
APPEARANCES:

William T. Bonham and Mark E. Phillips, Mularski, Bonham, Dittmer &
Phillips, LLC, Gahanna, Ohio, for Appellants/Cross-Appellees.

James R. Kingsley, Kingsley Law Office, Circleville, Ohio, for
Appellee/Cross-Appellant.

_____

McFarland, J.

{¶1} This is an appeal from the findings of fact and conclusions of

law entered by the Court of Common Pleas for Pickaway County, Ohio,

following a bench trial from April 10-12, 2018. These cases arise out of a

dispute between Appellants Steven Isaac, Jerry Isaac and Charles Isaac

(together, "Appellants") and their sister, Appellee Alice Malott

---

[1] These appeals were consolidated August 20, 2018.

("Appellee"), regarding her management of their father's affairs pursuant to a Power of Attorney ("POA") before his death and her administration of their father's estate, as its Executor, after his death. The trial court entered judgment for Appellee and against Appellants on all of their claims.

{¶2} On appeal, Appellants assert five assignments of error. Specifically, they contend the trial court erred in finding (1) their father, Ray Isaac, signed the POA granting Appellee the right to manage his affairs, (2) Appellee's attorney never received Appellant Steven Isaac's email containing an offer to purchase certain real estate from their father's estate, (3) an exhibit purporting to contain a summary of Appellants' damages was a statistical model based upon an inference upon an inference, (4) Appellants were not entitled to damages under R.C. 1337.37, and (5) that the estate liquidation company retained by Appellee itemized every item in decedent Ray Isaac's house. Because the trial court's challenged factual findings were not against the manifest weight of the evidence, all of Appellants' first, second and fifth assignments of error are overruled. Appellants' third and fourth assignments of error are overruled because the trial court did not commit any legal error in its consideration of Appellants' exhibit.

{¶3} As Cross-Appellant, Appellee asserts three assignments of error. She contends that the trial court erred by (1) awarding sanction fees against

Appellee for failure to produce her tax returns in response to a discovery request, (2) denying Appellee's motion for sanctions against Appellants for frivolous conduct, and (3) failing to hold a hearing before denying Appellee's motion for sanctions for frivolous conduct.  As Appellee waived her right to appeal the award of sanctions against her, her first assignment of error is overruled.  Appellee's second and third assignments of error are overruled because the trial court's denial of her motion for sanctions without conducting a hearing was not an abuse of discretion.  Accordingly, the judgment of the trial court is affirmed.

FACTS

{¶4}  Ray Isaac died testate in Pickaway County, Ohio, on June 15, 2015.  Appellants Steven Isaac, Jerry Isaac, and Charles Isaac, Appellee Alice Malott, and non-party Glenna Hisong are Ray Isaac's natural children.

{¶5}  On November 1, 2013, Ray Isaac underwent surgery for a neck fracture, which involved the insertion of wires into the C1 and C2 vertebras at the base of his skull.  On November 5, 2013, he was discharged from the hospital and taken to Appellant Steven Isaac's house to recuperate.

{¶6}  Due to his injury, Ray Isaac was unable to attend to his financial affairs, including the collection of rent for his many residential real estate properties.  The trial court found that Ray Isaac signed a Power of Attorney

("POA") naming Appellee as his attorney-in-fact so she could manage these tasks on his behalf. The trial court specifically found that on November 6, 2013, Appellee's husband, Wayne Malott, picked up the unsigned POA from Ray Isaac's attorney and took it to Steven Isaac's house. On the same day, Steven Isaac, Wayne Malott and Ray Isaac drove to Steven Isaac's bank in Grove City, where Ray Isaac signed the POA before a bank employee who was a notary public. Wayne Malott then delivered the signed POA to Appellee. Appellants contend that Ray Isaac never left the house on November 6, 2013 and never signed the POA.

{¶7} The trial court found that Appellee assisted Ray Isaac in managing his financial affairs pursuant to the POA. Appellee's husband collected rents on Ray Isaac's behalf for a period of time and Appellee assisted Ray Isaac in writing checks and making deposits into his bank account.

{¶8} In June 2014, Ray Isaac became an inpatient at Pickaway Manor Nursing Home. In June 2015, Ray Isaac's family decided that, due to his declining health, they would return him to his home to live with the assistance of hospice care. Appellee and her sister, Glenna Hisong, cleaned their father's home in anticipation of his arrival. However, on June 15,

2015, Ray Isaac died before his planned departure from Pickaway Manor. He was 87 years old.

{¶9} On June 25, 2015, Ray Isaac's Last Will and Testament was admitted to probate in Pickaway County Probate Court. Appellee was appointed the Executor of Ray Isaac's estate. Appellant Steven Isaac filed a complaint for an accounting in Probate Court and Appellants later filed objections to the inventory for Ray Isaac's estate. After issues relating to the accounting and objections were resolved, Steven Isaac voluntarily dismissed his accounting complaint. Appellants then filed additional objections to the inventory, which were withdrawn in August 2017.

{¶10} On April 1, 2016, Appellants brought this action in Pickaway County Common Pleas Court alleging that Appellee misappropriated assets from Ray Isaac before his death and from his estate after his death. They asserted claims for intentional interference with right of inheritance, breach of fiduciary duty, conversion and fraud. Appellee filed an Answer denying the complaint's material allegations and the case proceeded to discovery.

{¶11} During discovery, Appellee refused to produce her tax returns in response to Appellants' discovery requests. Appellants filed a motion to compel production of the tax returns, which the trial court granted. The trial court also granted Appellants their attorney fees in bringing the motion to

compel under Civ.R. 37. The trial court set the award of attorney fees for a hearing. Before the hearing date, however, Appellee paid Appellants the requested fee amount. As a result, Appellants withdrew their request for attorney fees and the hearing was canceled.

{¶12} On February 12, 2018, Appellee filed a motion for summary judgment, which was denied on March 23, 2018. From April 10 through April 12, 2018, the trial court held a bench trial on Appellants' claims. Post-trial the parties submitted proposed findings of fact and conclusions of law for the trial court's consideration. On June 11, 2018, the trial court entered an Order adopting Appellee's findings of fact and conclusions of law, subject to certain revisions, and finding that Appellants were not entitled to any relief on their claims.

{¶13} On June 14, 2018, Appellee filed a motion for sanctions for frivolous conduct under Civ.R. 11 and R.C. 2323.51. She argued Appellants should be sanctioned because they pursued their claims long after they knew they had no basis in fact. On July 23, 2018, the trial court overruled Appellee's motion for sanctions, which was the final appealable order immediately preceding this appeal.

APPELLANTS' ASSIGNMENTS OF ERROR

"I.     THE COURT ORDER FINDING DECEDENT, RAY ISAAC, SIGNED A POWER OF ATTORNEY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II.     THE TRIAL COURT COMMITTED ERROR BY FINDING THAT ATTORNEY TOOTLE NEVER RECEIVED THE EMAIL CONTAINING STEVEN ISAAC'S OFFER TO PURCHASE THE PROPERTY LOCATED AT 226 LOGAN STREET.  THE MANIFEST WEIGHT OF THE EVIDENCE INDICATES TO THE CONTRARY.

III.    THE TRIAL COURT COMMITTED ERROR WHEN IT FOUND THAT PLAINTIFFS' DAMAGES FOR MISAPPROPRIATION OF RENT WAS BASED UPON A STATISTICAL MODEL, AND BASED UPON AN INFERENCE UPON AN INFERENCE.

IV.     THE COURT ABUSED ITS JUDICIAL DISCRETION IN FINDING THAT DEFENDANT IS NOT LIABLE FOR DAMAGES UNDER ORC § 1337.37.

V.      THE COURT ERRED WHEN IT FOUND THE PARKERS ITEMIZED EVERY ITEM IN THE HOUSE.  THIS FINDING IS AGAINST THE WEIGHT OF THE EVIDENCE."

ASSIGNMENT OF ERROR I

{¶14}  In their first assignment of error, Appellants contend the trial court's finding that Ray Isaac signed the POA should be reversed because it was against the manifest weight of the evidence.

STANDARD OF REVIEW

{¶15}  "We will not reverse a trial court's judgment as against the manifest weight 'if it is supported by some competent, credible evidence.' "

*Hardert v. Neumann*, 4th Dist. Adams No. 13CA977, 2014-Ohio-1770, ¶ 18,

quoting *Nolen v. Rase*, 4th Dist. Scioto No. 13CA3536, 2013-Ohio-5680,

¶ 9, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972

N.E.2d 517, ¶ 14. When we review whether a trial court's decision is

against the manifest weight of the evidence, we weigh the evidence and all

reasonable inferences, consider the credibility of witnesses and determine

whether in resolving conflicts in the evidence, the factfinder clearly lost its

way and created such a manifest miscarriage of justice that we must reverse

the judgment. *Martin v. Jones*, 2015-Ohio-3168, 41 N.E.3d 123, ¶ 68 (4th

Dist.). We will reverse a judgment as being against the manifest weight of

the evidence only in the exceptional case where the evidence weighs heavily

against the judgment. *Pinkerton v. Salyers*, 4th Dist. Ross No. 13CA3388,

2015-Ohio-377, ¶ 18.

## LEGAL ANALYSIS

{¶16} The trial court's finding that Ray Isaac signed the POA

appointing Appellee as his attorney-in-fact was based in large part on its

assessment of witness testimony. The trial court explained:

> "Steven's testimony that [the signing of the POA] never
> happened is not credible. Plaintiff's witnesses testified that Ray
> was highly medicated and could do nothing. Defendant's
> witnesses testified that he was alert, aware and ambulatory.
> The day before, on 11/5/13, Ray signed three checks at
> Steven's house, including one for Steven's granddaughter,

Scarlett Abbitt[,] as a birthday gift. No handwriting expert provided testimony to this Court. To the untrained eye Ray's signature on the POA appears to match other documents in evidence. Presumably, if Ray was in such a deteriorated condition his handwriting would be affected. Plaintiffs did not challenge the deposition of Notary Melissa Wagner that she identified the signer by drivers license. Alice, in charge of notary tests in Pickaway County, anticipated identification would be necessary and provided Wayne with Ray's drivers license or a copy of it. Alice had Ray's drivers license having obtained the same when Ray entered the hospital. Steven's recollection is suspect as Plaintiffs' case is based upon the premise that the POA was forged. Ray Isaac was unexpectedly released from the hospital on November 5, 2013. The POA was signed on November 6, 2013. To find that the POA was forged, it is necessary to believe that the Defendant and/or Wayne Malott secured an impostor, arranged for him to travel to Grove City on November 6, 2013 where he then convinced the Notary he was Ray Isaac and provided, at least, a similar looking signature to the other documents in evidence. Alternatively, it is assumed that Wayne Malott could have gone to the bank in Grove City and impersonated his 85 year old father in law sufficiently convincing the Notary, and signed the POA in a similar looking signature to the other documents in evidence. Lastly, the Notary Melissa D. Wagner could have been part of the forgery plan. There was no proof of such involvement presented to this Court. Based upon the testimony provided, this Court is not willing to accept any of the three above stated scenarios, but rather find[s] that Ray Isaac appeared before the Notary on November 6, 2013 and signed the POA as her notarial attestation so provides."

{¶17} As demonstrated by the above, witness credibility weighed heavily in the trial court's finding that Ray Isaac signed the POA. In reviewing that finding, this Court must be mindful that "the credibility of witnesses and the weight given to the evidence are issues for the trier of

fact." *Britton v. Gibbs Assocs.*, 2009-Ohio-3943, ¶ 46; *see also State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967) ("In either a criminal or civil case the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."). As the Court has observed, "[t]he trier of fact is better suited than an appellate court to view the witnesses and observe their demeanor, gestures, and voice inflections and to use those observations in weighing credibility. Thus, the trier of fact is free to believe all, part, or none of the testimony of any witness who appears before it." *Britton* at ¶ 46. The trial court's finding that Steven Isaac and Appellants' witnesses were not credible and, conversely, that Appellee's witnesses were credible on this issue will not be disturbed.

{¶18} Having accepted the trial court's credibility determinations, there is little evidence left to support the contention that the trial court's finding is against the manifest weight of the evidence. Appellants cite testimony that Ray Isaac was heavily medicated for at least two weeks after his surgery and that he required assistance to move within Steven Isaac's house. However, the trial court also found credible testimony that Ray Isaac was "alert, aware and ambulatory" and had signed three checks the day before he signed the POA. In addition, the trial court accepted Wayne Malott's testimony that he and Steven Isaac accompanied Ray Isaac to the

bank.  Ray Isaac therefore had assistance to get to the bank and meet with the notary public.

{¶19}  Appellants also argue that no one testified to having seen Ray Isaac sign the POA or anyone giving Ray Isaac's drivers license to the notary.  Only four people could have witnessed these acts:  Steven Isaac, Wayne Mallot, the notary, and Ray Isaac himself.  Steven Isaac claimed that it never happened.  Wayne Mallot testified that he was with Steven and Ray Isaac at the bank when the POA was signed, but, from his vantage point, Wayne Mallot could not see Ray Isaac physically sign the POA or the notary receive Ray Isaac's drivers license.  The notary could not recall the specific event but was adamant that she did not vary from her standard operating procedure in witnessing Ray Isaac's signature on the POA.  That procedure involved (1) requiring a driver's license identification, (2) administering the oath, (3) inquiring about the document, (4) witnessing the signature, (5) signing as a notary and (6) placing her seal on the document.  The trial court found that the notary witnessed Ray Isaac's signature, as stated in the notarial attestation on the POA.  Thus, in context, the fact that no one recalled seeing Ray Isaac sign the POA or the notary receiving Ray Isaac's drivers license does not carry significant weight.

{¶20} The trial court was reasonable in its evaluation of the contention that Ray Isaac's signature on the POA was forged. The trial court noted that no handwriting expert testified in the case and, based on its review, the signature on the POA appeared to match Ray Isaac's signature on other documents. On appeal, Appellants argue that the trial court was "not qualified to render an opinion on this matter." This argument misconstrues the trial court's role in this case. In a bench trial, the trial judge assumes the jury's role as the trier of fact. The trial judge did not offer any opinion on the facts in this case; it entered findings of fact. One of those findings was that Ray Isaac's signature on the POA was authentic. *Cutshall v. Green,* 8th Dist. Cuyahoga No. 62447, 1993 WL 146562 (May 6, 1993).

{¶21} The trial court was also reasonable in finding Appellants' alternative theories implausible. In order to find Ray Isaac's signature was forged, the trial court would also have to find one of the following scenarios occurred: (1) that Wayne Mallot signed the POA by impersonating Ray Isaac before the notary, (2) that Wayne Mallot found a doppelganger for Ray Isaac to present to the notary, or (3) that the notary lied in her attestation and later when testifying under oath at her deposition. As the trial court noted, there was no evidence to support a finding that any of these things happened.

{¶22}  In summary, the trial court's finding that Ray Isaac signed the POA before the notary, as stated in the notary's attestation, is reasonably supported by competent and credible evidence.  Accordingly, Appellants' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

{¶23}  In their second assignment of error, Appellants contend the trial court erred by finding that the attorney for Ray Isaac's estate never received an email containing Steven Isaac's offer to purchase certain real estate.  This finding may be reversed only if it is against the manifest weight of the evidence.

## ANALYSIS

{¶24}  Among Ray Isaac's real estate was a property located at 226 Logan Street, Circleville, Ohio, 43113.  Appellant Steven Isaac testified that on January 20, 2016, he sent an email to the estate's attorney offering to purchase the 226 Logan Street property for $47,500.00, less the six percent commission for realtor's fees and the twenty percent that he would receive as a beneficiary of his father's estate.  Steven Isaac testified that the offer was to remain open for five days, but he never received a response from the estate's attorney.

{¶25} The estate's attorney testified that he did not know about Steven Isaac's offer, but admitted that he later found Steven Isaac's email, or at least portions of it, in his files while preparing for trial. On direct examination, the estate's attorney testified regarding whether the email was properly addressed to his office:

> Q.    So from appearances, does it look like – that the email was correctly addressed to your office?
> A.    Well, I'm not very astute when it comes to emails. Now, this does not have tootlelawoffice@gmail.com. It just says to Tootle Law Office. I don't know.
>
> Q.    Okay. All right. They're –
>
> THE COURT: Let me see it here. Thanks.
> All right. Well, I'm not the best at this either, but I'll bet your secretary would know.
> My question is, when you receive emails, does it say Tootle Law Office or tootlelawoffice@hotmail.com or – you don't know that?
>
> THE WITNESS: I – I think it does, but I don't know.
>
> THE COURT: Well –
>
> THE WITNESS: Actually, I don't even have a computer in my office. My secretary receives those.
>
> THE COURT: Just as an example, at the top, it says from Steve Isaac. That part makes sense. But then it says where it's actually from. It's – maybe this is how they are, but it just seemed strange that there's not actually a real email address title to it. Maybe that's how they receive it. That's something that the Court probably should know to know where this went; whether you got it, whether anybody got it at your place. I don't know. I've just never seen anything – I mean, I

don't think I can just type in Tootle Law Office and send you something.  It just doesn't seem like the way I could do it. Okay.  That would be interesting.

{¶26}  While it expressed doubt in this exchange, the trial court never found that the estate's attorney did not receive Steven Isaac's email. Appellants and Appellee both assume the trial court made such a finding, but neither cites where that finding appears in the record.  Appellee's Proposed Findings of Fact and Conclusions of Law, which the trial court incorporated by reference, does not contain a finding that the estate's attorney never received the email.  In the Findings of Fact section, it states "Mr. Tootle [the estate's attorney] says he never received the email so he never told Alice." Similarly, among the Conclusions of Law, it repeats the assertion that "Attorney Tootle stated he never received [Steven's email]."  The recital of testimony is not an adoption of the facts asserted therein.

{¶27}  Instead, the trial court relied on the fact that there was no evidence the estate's attorney communicated Steven Isaac's offer to Appellee.  Appellee's Proposed Findings of Fact and Conclusions of Law contained the following statement adopted by the trial court:  "Steven cannot claim Alice defaulted when Steven admits that the email was directed to Mr. Tootle and not Alice and Mr. Tootle states he never informed Alice of the offer because he was unaware of it."  In the Order adopting these findings of

fact, the trial court further wrote: "There was no evidence that Attorney Tootle communicated Steven's offer to the Defendant. Steven did not follow up on his email. Jerry and Charles did not testify at trial." The trial court added in a section regarding damages: "The only evidence presented that Steven, or anyone, was damaged was that he was not given the opportunity to purchase Logan Street for $47,500.00 which was handled appropriately by the Defendant with the information that was made available to her and pursuant to law." This statement underscores that, in the trial court's view, the material fact was that Appellee was not made aware of Steven Isaac's offer.

{¶28}  The question of whether Appellee can be held liable for failing to act on information that the estate's attorney either knew or should have known is a legal, not factual, issue. It is evident that the trial court concluded Appellee could not be held liable based on her imputed knowledge of such information. This legal conclusion, however, was not identified as an assignment of error. As a result, it has not been properly briefed and is not before the Court. App.R. 16(A)(3) (appellant's brief must include "[a] statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected"). Appellants' second assignment of error is overruled.

ASSIGNMENT OF ERROR III

**{¶29}** In their third assignment of error, Appellants contend the trial court committed a legal error by finding an exhibit summarizing their alleged damages for misappropriation of rent was a statistical model based upon an inference upon an inference.

STANDARD OF REVIEW

**{¶30}** A trial court has broad discretion in the admission or exclusion of evidence. *Oyer v. Adler*, 2015-Ohio-1722, ¶ 14, 33 N.E.3d 71 (4th Dist.). Accordingly, the Court will not reverse the trial court's judgment on evidentiary matters absent a clear showing of an abuse of discretion with material prejudice. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991); *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). "A finding that a trial court abused its discretion implies that the court acted unreasonably, arbitrarily, or unconscionably." *Oyer* at ¶ 14. When applying the abuse of discretion standard, the Court must not substitute its judgment for that of the trial court. *Id.*

ANALYSIS

**{¶31}** At trial, Appellants introduced an exhibit, marked Plaintiffs' Exhibit 16, summarizing their analysis of Ray Isaac's bank accounts, Appellee's and her husband's bank accounts, and the actual and maximum

potential income from Ray Isaac's rental properties.  Appellants relied on

Exhibit 16 to support their allegation that Appellee stole cash rental

payments from Ray Isaac, including the amount allegedly stolen.

{¶32}  Under the heading "Evidence" in the Order adopting

Appellee's Findings of Fact and Conclusions of Law, the trial court wrote:

> At trial, Plaintiffs attempted to prove that Alice stole rents in
> the amount of $61,861.00 from 2012 until 2016.  Proof was
> using an annual, statistical model, which started with possible
> rents less rents declared on the tax return compared to cash
> deposits into Ray's and into Alice's and Wayne's account.

The trial court again referred to Exhibit 16 in its analysis of Appellants'

claim for misappropriation of rents:

> Plaintiffs' theory that rents were stolen by Alice fails not only
> because Alice did not collect the rents in 2012, but also because
> it is based upon a statistical model which is based upon an
> inference upon an inference and, in fact, many inferences.
> Further, the basic fact from which an inference is drawn was
> not proven – that money was missing. . . ."

Appellants object to the trial court's referral to Exhibit 16 as a "statistical

model" and the finding that it was based upon multiple inferences.

{¶33}  Appellants first observe that they are permitted to introduce a

summary of voluminous information or evidence in the record under Evid.R.

1006.  While this is an accurate statement of the rule, the trial court did not

find that it was improper for Appellants to summarize the multiple checks

and deposit entries produced in discovery in a single demonstrative exhibit.

*See* Evid.R. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."). Appellants' position appears to be that, if Exhibit 16 was a summary of evidence under Evid.R. 1006, it was improper to refer to it as a statistical model.

{¶34} The significance of referring to Exhibit 16 as a statistical model is not clear from Appellants' memorandum. Appellants do not define the term "statistical model" or explain why referring to Exhibit 16 as a statistical model would render it any less persuasive as a matter of law. An unrestricted Westlaw search for the term "statistical model" in all Ohio cases delivers just three results. *See State v. Warren*, 11th Dist. Trumbull No. 2010–T–0027, 2011-Ohio-4886, ¶ 16; *State v. Lane*, 1st Dist. Hamilton No. C-970776, 1998 WL 906350, at *2 (Dec. 31, 1998); *State v. Clark*, 101 Ohio App.3d 389, 417, 655 N.E.2d 795 (8th Dist. 1995). *Warren* and *Lane* involve the analysis of DNA testing results. *Clark* cites the use of a statistical model in its discussion of the admissibility of computer-generated simulations or reconstructions. None of these cases held that statistical models are inadmissible or are not probative as a matter of law. Thus, the fact that the trial court called Exhibit 16 a statistical model instead of a Rule 16 summary has no effect on its admissibility or the weight that it may be

afforded.  Consequently, rather than determine if the trial court appropriately used that term, the Court finds any such error, if an error were indeed made, was harmless.  *See* Civ.R. 61.

{¶35}  The second question presented under Appellants' third assignment of error goes to the actual weight the trial court afforded Exhibit 16.  Appellants argue that the trial court should not have dismissed Exhibit 16's probative value because it was based upon an inference upon an inference.  They argue its conclusions were grounded in fact and therefore entitled to substantial weight.

{¶36}  Addressing this issue in *Hurt v. Charles J. Rogers Transportation Co.*, 164 Ohio St. 329, 120 N.E.2d 820 (1955), the Supreme Court of Ohio held that "[a]n inference which is based solely and entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and is universally condemned."  *Hurt* at 333.  In contrast, "[a]n inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce."  *Id.*

{¶37}  Appellants cite Steven Isaac's testimony for an explanation of Exhibit 16, which covers the period from 2012 to 2016.  He testified the first

line of Exhibit 16 contains deposits into Ray Isaac's US Bank account. The second line contains the rental income reported in Ray Isaac's tax returns. The third line contains the maximum potential rental income from Ray Isaac's rental properties on an annual basis, which was calculated by multiplying the estimated monthly rent for all of his properties times twelve (the number of months in a year). Steven Isaac testified that he adjusted this calculation each year to account for properties sold during the period. Steven Isaac calculated the figure in the fourth line of the exhibit by subtracting the reported rental income from the maximum potential rental income, and then stating that sum as a percentage of reported rental income. He referred to this rate as the vacancy rate, which was intended to reflect the percentage of properties that were not rented (or at least not producing income).

{¶38} Exhibit 16 juxtaposes the above information against the cash deposits into Appellee's and her husband's bank accounts during the same period. Appellants argued that the decrease in rental income from 2012 to 2016 corresponds with an increase in cash deposits into Appellee's and her husband's accounts. The reason for this "pattern"—according to Appellants—was that Appellee was stealing cash rental payments from Ray Isaac before and after his death.

{¶39} Based on the above explanation, Exhibit 16 contains a combination of empirical facts and calculations based in part on those empirical facts and in part on estimates provided by Steven Isaac. Appellants' conclusion that Appellee stole Ray Isaac's cash rental payments is based on inferences from these empirical facts and calculations.

{¶40} The first inference necessary to reach this conclusion is incorporated into the calculation of the vacancy rate. To determine the maximum potential rental income per year, Appellants had to infer the amount of rent that could be charged for all of Ray Isaac's rental properties, even those properties that were not in fact rented. Steven Isaac testified that he determined these hypothetical monthly rent numbers based on known data, but this determination was nonetheless an inference from that data because Ray Isaac never rented all of his properties in any single year.

{¶41} Appellants also inferred that the increasing vacancy rate, which incorporates their assumptions regarding maximum potential rental income, was the result of theft. This inference was based on the fact that, as the vacancy rate increased (or rental income decreased), the cash deposits into Appellee's and her husband's accounts increased. In addition, Appellants were suspicious of Appellee based on the fact that she was her father's attorney-in-fact from 2013 until his death and executor of his estate.

{¶42} The trial court therefore did not err in finding that the evidence of theft contained in Exhibit 16 was based upon an inference upon an inference. Since the inferences have some, albeit spare, factual support, they are permissible so long as they are "reasonable conclusion[s] for the jury to deduce." *Hurt*, 164 Ohio St. at 333. The trial court essentially found that it was not reasonable for the trier of fact to deduce that Appellee stole cash rental payments from Ray Isaac based on Exhibit 16. This finding was not an abuse of discretion.

{¶43} The facts supporting the theft allegation were quite spare. Put simply, there was no direct evidence of theft. There was not any evidence, a paper trail for instance, connecting any monies paid as rent and the deposits into Appellee's or her husband's accounts. As the trial court noted, there was not even evidence that any money was missing from the collection of rental payments. During a colloquy with the trial court, Steven Isaac acknowledged that the expense of maintaining aging rental properties and the fact that low-income rental properties have higher turnover rates could decrease rental income. These factors were not incorporated into the vacancy rate, however, because Steven calculated the numbers only "with the facts that have been provided."

{¶44} Appellants also did not reconcile their theory with the actual receipts issued for rental payments, even though there was testimony that receipts were always issued. Appellee also cites testimony showing that the alleged "pattern" of decreasing rental income and increasing cash deposits in Appellee's and her husband's accounts existed since 2010—three years before she was responsible for managing her father's affairs under the POA. Finally, Appellee and her husband both testified that they did not steal rent payments and explained the deposits into their accounts. The trial court, which was in the best position to assess that testimony, found it credible.

{¶45} In light of the above, the trial court did not abuse its discretion in rejecting the inference upon an inference that Appellee misappropriated Ray Isaac's rental payments. Accordingly, Appellants' third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

{¶46} In their fourth assignment of error, Appellants contend that the trial court abused its discretion in finding that Appellee was not liable for damages under R.C. 1337.37. Appellants concede that this assignment of error is moot if the Court finds that the trial court did not err in its consideration of Exhibit 16. Having so found, the Court overrules Appellants' fourth assignment of error.

ASSIGNMENT OF ERROR V

{¶47}  In their fifth assignment of error, Appellants contend the trial court's finding that every item in Ray Isaac's home was itemized was against the manifest weight of the evidence.

ANALYSIS

{¶48}  In connection with the administration of Ray Isaac's estate, Appellee retained an estate liquidation company called Tag Sale Solutions, which was run by Jim and Dawn Parker, to do a tag sale.  The trial court found that the Parkers provided "a complete inventory of every itty-bitty item" in Ray Isaac's house and that Appellee "prepared a chart of who got everything before and after."

{¶49}  Appellants argue that the manifest weight of the evidence establishes that the Parkers did not, in fact, itemize every item in Ray Isaac's house.  They cite Megan Isaac's testimony regarding the days before Ray Isaac's death, when his family was preparing to bring him home from Pickaway Manor Nursing Home so that he could be at his own home before passing.  Megan Isaac testified that there was a focus on cleaning the back room and the kitchen during that time.  The family was planning on setting up the hospital bed for him in the back room.  People were sitting items next to the front door, taking boxes out and going through closets.  She did not

know exactly what left the house, but people were taking things out. Appellants note that the Parkers were not hired until January 2016, after Ray Isaac's death. Thus, they could not have itemized the property removed from Ray Isaac's home before his death.

{¶50} Appellants also note that the trial court cited Appellee's Exhibit O as containing both the "complete inventory" provided by the Parkers and the chart prepared by Appellee showing "who got everything before and after." Appellants contend that this is further evidence of the trial court's error because the Parkers could not have itemized the items disposed of before Ray Isaac's death.

{¶51} The trial court's finding that the Parkers itemized everything in the house was not against the manifest weight of the evidence. There was competent, credible evidence at trial that many of the items taken from Ray Isaac's home in preparation for his return were of little to no value. A lot of the activity involved cleaning Ray's home and removing trash. Glenna Hisong, Ray Isaac's youngest daughter, testified that Ray Isaac was lucid and competent right up to his death. She discussed with him the topic of giving some things away from the house, to which he gave his consent. Items that were given away with Ray Isaac's consent were not part of his

estate. Therefore, there was no reason for them to be included in the itemization.

{¶52} The trial court's reference to Exhibit O as containing both the Parkers' itemization and Appellee's chart is not inherently contradictory. It stands to reason that the Parkers' itemization was incorporated into Appellee's chart, which explains the information contained therein. In sum, there was substantial evidence supporting the trial court's finding—it was not against the manifest weight of the evidence.

{¶53} Appellants' fifth assignment of error also lacks merit because, as the trial court noted, Appellants failed to show that any of the items allegedly excluded from the itemization caused any damages. Appellants therefore failed to show the trial court's finding prejudiced them. For both of these reasons, Appellants' fifth assignment of error is overruled.

APPELLEE/CROSS-APPELLANT'S ASSIGNMENTS OF ERROR

"I.   THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANTS WHEN IT AWARDED SANCTION FEES FOR FAILURE TO PRODUCE TAX RETURNS.

II.   THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANTS WHEN IT DENIED SANCTIONS FOR FRIVOLOUS CONDUCT.

III.  THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANTS WHEN IT FAILED TO HOLD A HEARING BEFORE DENYING SANCTIONS FOR FRIVOLOUS CONDUCT."

ASSIGNMENT OF ERROR I

{¶54} In Cross-Appellant's first assignment of error, she contends the trial court erred when it awarded sanction fees against her for failure to produce her tax returns.

ANALYSIS

{¶55} Cross-Appellant raises four issues for review under her first assignment of error. The Court need not consider any of them, however, because it is apparent that Cross-Appellant waived her right to appeal the award of sanction fees in this case. Indeed, Cross-Appellant's assertion that the trial court awarded sanction fees is procedurally inaccurate. The trial court never had the opportunity to enter a final ruling on Cross-Appellees' request for fees because Cross-Appellant paid them before the scheduled hearing on the matter, rendering the request moot.

{¶56} The relevant timeline is as follows. On September 1, 2017, Cross-Appellees filed a motion to compel production of Cross-Appellant's tax returns. The motion to compel included a request for payment of their reasonable expenses, including attorney fees, in bringing the motion under Civil Rule 37(A)(5)(a). On September 27, 2017, Cross-Appellant filed a

memorandum in opposition to the motion to compel. Cross-Appellant argued that she should not be required to produce her tax returns, but did not directly address the request for reasonable expenses, including attorney fees, if the motion were granted. On October 25, 2017, the trial court granted the motion to compel and scheduled a hearing on the request for attorney fees, at which all parties were required to personally appear, for January 18, 2018.

{¶57} The hearing on the request for attorney fees never occurred. On January 15, 2018, Cross-Appellees' counsel received a letter from Cross-Appellant's counsel indicating that a check for the requested attorney fees ($890.00) was being sent. On January 17, 2018, Cross-Appellees' counsel received the check and filed a motion to withdraw the request for attorney fees. On January 18, 2018, the trial court granted the motion to withdraw, stating that the issue was moot.

{¶58} By paying the requested fees prior to the hearing on the matter, Cross-Appellant waived her right to appeal the payment of those fees. Under Civ.R. 37, if a motion to compel is granted, "the court shall, *after giving an opportunity to be heard*, require the party [. . .] whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Civ.R. 37(A)(5) (emphasis added). Cross-

Appellant could have raised any objections to the award of fees to the trial court at the scheduled hearing. Cross-Appellant declined to do so, thereby waiving her right to appeal her payment of those fees.

{¶59} Appellate courts "will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). "It is axiomatic that issues not presented for consideration below will not be considered on appeal." *Dailey v. Uhrig*, 4th Dist. Ross No. 06CA2911, 2008-Ohio-1396, ¶¶ 22-23. Accordingly, Cross-Appellant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

{¶60} In her second assignment of error, Cross-Appellant contends the trial court erred when it denied her motion for sanctions against Cross-Appellees for frivolous conduct.

## STANDARD OF REVIEW

{¶61} Civ.R. 11 provides that for pleadings, motions, and other documents signed by attorneys representing parties in a case, the signature of an attorney "constitutes a certificate by the attorney * * * that the attorney * * * has read the document; that to the best of the attorney's * * *

knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay." The rule further provides that "[f]or a willful violation of this rule, an attorney * * *, upon motion of a party or upon the court's own motion, may be subjected to appropriate action, including an award to the opposing party of expenses and reasonable attorney fees incurred in bringing any motion under this rule." *Capital One Bank v. Day*, 176 Ohio App.3d 516, 2008-Ohio-2789, 892 N.E.2d 932, ¶ 9 (4th Dist.).

{¶62} "We will not reverse a court's decision on a Civ.R. 11 motion for sanctions absent an abuse of discretion. *State ex rel. Fant v. Sykes*, 29 Ohio St.3d 65, 505 N.E.2d 966 (1987). An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *State ex rel. Worrell v. Ohio Police & Fire Pension Fund*, 112 Ohio St.3d 116, 2006-Ohio-6513, 858 N.E.2d 380, ¶ 10." *Capital One Bank* at ¶ 8, quoting *State ex rel. Dreamer v. Mason*, 115 Ohio St.3d 190, 2007-Ohio-4789, 874 N.E.2d 510, ¶ 18.

{¶63} "R.C. 2323.51 provides for an award of attorney fees to a party harmed by 'frivolous conduct' in a civil action." *Rose v. Cochran*, 4th Dist. Ross No. 14CA3445, 2014-Ohio-4979, ¶ 35, quoting *Moss v. Bush*, 105 Ohio St.3d 458, 2005-Ohio-2419, 828 N.E.2d 994, ¶ 18 fn. 3. "The General

Assembly vests the decision whether to award sanctions, including an award of reasonable attorney fees, in the court." *State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶ 10; *see* R.C. 2323.51(B)(1) ("The court may assess and make an award to any party to the civil action or appeal who was adversely affected by frivolous conduct"). The trial court's decision whether to award sanctions under R.C. 2323.51 will not be reversed absent an abuse of discretion. *Striker* at ¶ 11.

{¶64} When the question regarding what constitutes frivolous conduct calls for a legal determination, such as whether a claim is warranted under existing law, an appellate court is to review the frivolous conduct determination de novo, without reference to the trial court's decision. *Ogle v. Greco*, 4th Dist. Hocking No. 15CA2, 2015-Ohio-4841, ¶ 30; *Natl. Check Bur. v. Patel*, 2nd Dist. Montgomery No. 21051, 2005-Ohio-6679, ¶ 10; *accord Riverview Health Inst., L.L.C. v. Kral*, 2nd Dist. Montgomery No. 24931, 2012-Ohio-3502, ¶ 33.

## ANALYSIS

{¶65} "Civ.R. 11 employs a subjective bad-faith standard to invoke sanctions by requiring that any violation must be willful. *Riston v. Butler*, 149 Ohio App.3d 390, 2002-Ohio-2308, 777 N.E.2d 857 (1st Dist.), at ¶ 9; *Ransom v. Ransom*, 12th Dist. Warren No. 2006-03-031, 2007-Ohio-457

[2007 WL 313465], at ¶ 25." *Day* at ¶ 10, quoting *Dreamer*, 2007-Ohio-4789, ¶ 19.  Thus, any violation must be willful; negligence is insufficient to invoke Civ.R. 11 sanctions.  *Oakley v. Nolan*, 4th Dist. Athens No. 06CA36, 2007-Ohio-4794, ¶ 13.

{¶66}  "The United States Supreme Court has observed that the purpose of Fed.R.Civ.P. 11, which is analogous to Civ.R. 11, is to curb abuse of the judicial system because '[b]aseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay.'  *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 398, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).  The court noted that the specter of Rule 11 sanctions encourages civil litigants to '"stop, think and investigate more carefully before serving and filing papers."'  *Day, supra,* at ¶ 11, quoting Amendments to Federal Rules of Civil Procedure (1983), 97 F.R.D. 165, 192 (March 9, 1982 letter from Judge Walter Mansfield, Chairman, Advisory Committee on Civil Rules)."  *Moss v. Bush*, 105 Ohio St.3d 458, 2005-Ohio-2419, 828 N.E.2d 994, ¶ 21.

{¶67}  Frivolous conduct implicated by R.C. 2323.51(A)(2)(ii) involves proceeding on a legal theory which is wholly unwarranted in law.  *Ogle, supra,* at ¶ 29; *State Auto Mut. Ins. Co. v. Tatone*, 2nd Dist. Montgomery No. 21753, 2007-Ohio-4726, ¶ 8.  "Whether a claim is

warranted under existing law is an objective consideration." *Hickman v. Murray*, 2nd Dist. Montgomery No. CA 15030, 1996 WL 125916, \*5 (Mar. 22, 1996) (citations omitted).  The test is "whether no reasonable lawyer would have brought the action in light of the existing law.  In other words, a claim is frivolous if it is absolutely clear under the existing law that no reasonable lawyer could argue the claim." *Id*.  Frivolous conduct subject to sanctions includes conduct by a party's counsel that "obviously serves to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation" or "is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law."  R.C. 2323.51(A)(2)(a)(i) and (ii).

{¶68}  On June 14, 2018, after the trial court's entry of judgment, Cross-Appellant filed a motion to impose sanctions on Cross-Appellees pursuant to Civ. R. 11 and R.C. 2323.51.  Cross-Appellant argued sanctions were appropriate because Cross-Appellees' claims were not well-founded from the outset and they continued to pursue them even after discovery confirmed their lack of factual support.  In opposition, Cross-Appellees

argued their claims were viable under the applicable statutes, as demonstrated by the trial court's denial of Cross-Appellant's motion for summary judgment. They also argued that it was reasonable for Cross-Appellees' counsel to rely on their representations in litigating their claims.

{¶69} On July 23, 2018, the trial court denied the motion for sanctions. In its order, the trial court found that "the actions of the Plaintiffs and Plaintiffs' counsel do not rise to the level of frivolous conduct pursuant to RC 2323.51. The case presented by the Plaintiffs, though being insufficient to meet their burden of proof on any claim, did not portray frivolous conduct or bad faith such that a Motion for Sanctions is required herein."

{¶70} In evaluating the denial of Cross-Appellant's motion, it is important to recognize that she sought sanctions for filing the action and continuing to litigate the action—not a discrete claim or motion. The trial court therefore considered the entire case, not individual actions by Cross-Appellees and their counsel. On appeal, Cross-Appellant focuses on particular legal theories and allegations, instead of the broader question of whether Cross-Appellees acted in bad faith or frivolously in bringing and pursuing this action through trial. Upon consideration of the entire case and

all of the evidence relevant to Cross-Appellees' claims, the trial court did not abuse its discretion in denying the motion for sanctions.

**{¶71}** Cross-Appellees' complaint included four claims long recognized under Ohio law, namely intentional interference with expectancy of inheritance, breach of fiduciary duty, conversion and fraud. The trial court found that Cross-Appellees' presented sufficient evidence on these claims to survive Cross-Appellants' motion for summary judgment. In light of that ruling, it was reasonable for Cross-Appellees to take their claims to trial. In addition, although the trial court ultimately rejected much of Cross-Appellees' evidence as not credible, their counsel cannot be faulted for relying on his clients' representations. *See Kozar v. Bio-Med. Applications of Ohio, Inc.*, 9th Dist. Summit No. 21949, 2004-Ohio-4963, ¶ 12 ("An attorney's reasonable reliance on the client's representations does not constitute bad faith.").

**{¶72}** Cross-Appellant cites *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368 (6th Cir. 1996) for the proposition that frivolous conduct may exist even though a case survives summary judgment. *Runfola*, however, does not stand for that proposition.

**{¶73}** *Runfola* involved a dispute between competing court reporting businesses. Two of the plaintiff's most utilized court reporters left

plaintiff's business and formed their own court reporting firm. *Runfola*, 88

F.3d at 370. After losing clients and staff to the new firm, plaintiff sued the

new firm, called Spectrum, and another court reporting firm, named PRI, for

violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and unfair business

practices in violation of state law. *Id*. at 371. Spectrum and PRI moved to

dismiss the lawsuit, which the court denied. In overruling the motion,

however, the court warned that plaintiff would need to discover facts

sufficient to maintain its civil action. *Id*. at 370. A few months later, the

court sustained a dispositive motion on all but one of the counts, which

alleged breach of a covenant not to compete.

{¶74} Despite the court's warning, for the next 15 months, the

plaintiff failed to pursue any discovery. Plaintiff then served thirteen notices

of deposition, but the depositions never went forward. Defendants filed

motions for summary judgment, which plaintiff responded to over six

months later. In its opposition, plaintiff offered only one exhibit, the fifteen-

page affidavit of its principal. Granting the motions for summary judgment,

the court found plaintiff produced no evidence of any harm to competition to

support an antitrust violation. The court later granted defendants' motion for

sanctions under Fed. R. Civ. P. 11.

{¶75} On appeal, the Sixth Circuit affirmed the award of sanctions. It noted that sanctions were imposed "for the manner in which plaintiff excessively lengthened the discovery process yet failed to voluntarily dismiss this action after becoming aware of their inability to assert any competent evidence to support their claims." *Id.* at 373. It further noted "plaintiff was given over two and one half years to conduct enough discovery to defeat a motion for summary judgment. However, the only evidence plaintiff presented was a fifteen-page affidavit which was stricken by the district court for its baselessness. Plaintiff's tactics forced defendants to expend significant time and money in defense of a meritless action." *Id.*

{¶76} *Runfola* does not stand for the proposition that sanctions may be imposed for failure to voluntarily dismiss claims that have survived a motion for summary judgment—as Cross-Appellee argues. Instead, *Runfola* upholds the award of sanctions where a plaintiff survives a motion to dismiss but then abandons its claims.

{¶77} This case is also distinguishable from *Runfola* because, here, Cross-Appellees vigorously pursued discovery. When Cross-Appellant refused to respond to their requests, Cross-Appellees filed and obtained relief through a motion to compel. If there were any delay in this case, a substantial portion of it may be rightfully attributed to Cross-Appellant. In

any event, the fact that Cross-Appellees survived a motion for summary judgment is a significant barrier to Cross-Appellant's motion for sanctions. It is a holding by the trial court that Cross-Appellees mustered sufficient evidence to proceed to trial on their claims.

{¶78} Bear in the mind that the Court does not hold that a party that survives summary judgment can never be subject to sanctions under Civ.R. 11 or R.C. 2323.51. Here, however, Cross-Appellant has not shown that Cross-Appellees or their counsel were objectively unreasonable in relying on their evidence, or did so in bad faith, in light of the trial court's ruling. Cross-Appellant argues there was no evidence of waste or damages from the allegedly forged POA, but Cross-Appellees believed that Exhibit 16 would be persuasive on these issues. Cross-Appellant similarly argues there was no evidence that Cross-Appellant made any gifts prohibited by the POA, only evidence that Glenna Hisong made gifts with Ray Isaac's consent. However, Cross-Appellees presented testimony, for example, from a witness who saw items removed from Ray Isaac's house while Cross-Appellant appeared to be in control of the activity there. Unlike the plaintiff in *Runfola*, Cross-Appellees had evidence to support their claims. It was simply not as persuasive as Cross-Appellant's evidence.

{¶79} The legal errors cited by Cross-Appellant also do not require reversal of the trial court's decision on sanctions. Cross-Appellant argues that Cross-Appellees' counsel failed to file a complaint in probate court to recover concealed assets under RC 2109.50 and was incorrect in contending Cross-Appellant required the probate court's consent to sell real estate and to spend more than $100.00 on the rental properties. Cross-Appellant has not shown that these errors were made in bad faith or that they were so material that they rendered Cross-Appellees' pursuit of their civil action unreasonable as a matter of law.

{¶80} For the above reasons, Cross-Appellant's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

{¶81} In her third assignment of error, Cross-Appellant contends the trial court erred because it failed to hold a hearing before denying Cross-Appellant's motion for sanctions for frivolous conduct.

## ANALYSIS

{¶82} Cross-Appellant does not explain why the trial court erred by failing to hold a hearing on her motion for sanctions. She merely cites one case, *State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, 978 N.E.2d 188, and represents that it is applicable here. Cross-Appellant's

reference to "frivolous conduct" in her assignment of error implies her argument is based upon R.C. 2323.51.

{¶83} R.C. 2323.51(B)(2) provides that an award of sanctions for frivolous conduct may be made only after the court conducts a hearing "to determine whether particular conduct was frivolous, to determine, if the conduct was frivolous, whether any party was adversely affected by it, and to determine, if an award is to be made, the amount of that award." R.C. 2323.51(B)(2)(a). On its face, the statute appears to make a hearing mandatory only before an award of sanctions may be made, not when a request for such an award is denied.

{¶84} Cross-Appellant's citation to *Ricketts* is inapposite because that case dealt with the granting of a motion for sanctions under Civ.R. 11. *Ricketts* at ¶ 24-25 ("Because Ricketts sought and was granted an award of fees and expenses pursuant to Civ.R. 11, the court of appeals erred in imposing sanctions under the rule without holding an evidentiary hearing.").

{¶85} Cross-Appellees, however, cite a case directly on point, *State ex rel. Ward v. The Lion's Den*, 4th Dist. Ross No. 1867, 1992 WL 487197 (Nov. 25, 1992). In that case, after entering summary judgment for the appellant, the trial court denied appellant's motion for sanctions under Civ.R. 11 and R.C. 2323.51. On appeal, the appellant argued the trial court

erred because it failed to hold a hearing before denying the motion.  This

Court noted a split of authority among appellate districts regarding the

necessity of holding hearings under R.C. 2323.51(B)(2) where the trial court

overrules the motion for sanctions.  *Lion's Den*, 1992 WL 487197, at *2.

Some cases held a hearing is required only if attorney fees are to be

awarded, while others held a hearing is required regardless of the outcome of

the motion for sanctions.  *Id.*

{¶86}  The Court acknowledged it had held in another case, *Shaffer v.*

*Mease*, 66 Ohio App.3d 400, 584 N.E.2d 77 (4th Dist. 1991), that "the trial

court may award attorney fees only after conducting a hearing that allows

the parties to present evidence in support or opposition to such award."

*Lion's Den*, 1992 WL 487197, at *3.  The Court distinguished this holding

in *Shaffer*, however, because it was an appeal from an award of attorney fees

rather than a denial.  The Court further distinguished *Shaffer* because, unlike

in that case, there was no claim by either party that a factual dispute existed

regarding whether sanctions should be entered.  Rather, the motion was

framed as a legal issue—whether or not sanctions were appropriate when a

statutory agent is named as a defendant in a nuisance action.  *Id.*  The Court

also noted, "although appellant requested a hearing on the *amount* of

attorney fees if the trial court granted its motion for sanctions, it never

requested an evidentiary hearing on the *propriety* of an award of attorney

fees, essentially conceding that the issue could be decided without any

hearing." *Id.* (emphasis in original).  Finally, the Court noted that the

appellant's written argument on appeal failed to address the issue.  For all

these reasons, the Court held the trial court did not abuse its discretion in

failing to hold an evidentiary hearing on the appellant's motion for

sanctions.

{¶87}  This case is remarkably similar to *Lion's Den*.  It involves the

denial of a motion for sanctions under Civ.R. 11 and R.C. 2323.51.  Since

Cross-Appellant brought the motion for sanctions post-judgment, all of the

facts necessary to decide it were already before the trial court.  Additionally,

as in *Lion's Den*, Cross-Appellant only requested a hearing on the amount of

reasonable attorney fees if the trial court granted her motion.  She never

requested a hearing on the propriety of awarding sanctions.  Finally, Cross-

Appellant has failed to support her assignment of error with pertinent

argument, instead citing an inapposite case involving an award of sanctions

under Civ.R. 11.

{¶88}  For these reasons, as in *Lion's Den*, the Court finds the trial

court did not abuse its discretion in denying the motion for sanctions without

a hearing.  Cross-Appellant's third assignment of error is overruled.

{¶89}  Accordingly, after thorough review of the record and based on the foregoing, we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED.  Costs are assessed to Appellants/Cross-Appellees.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.:  Concur in Judgment and Opinion.


For the Court,


BY:  _____
Matthew W. McFarland, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**